**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Mark A. Waldvogel, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with the account "Courageous Conduct: Civilian Self-Defense," the account that posted the video located at: https://www.youtube.com/watch?v=YW9oAQ4FHnw, that is stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since May 1998.  I am currently assigned to the Detroit Division, working in the Kalamazoo Resident Agency.  As a Special Agent with the FBI, I investigate violations of Federal Law including Title 18, United States Code, Section 248, Freedom of Access to Clinic Entrances Act.  I have received training and conducted numerous investigations relating to the use of the internet and social media platforms.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, section 248, Freedom of Access to Clinic Entrances Act, and Title 18, United States Code, Section 844, arson, have been committed by Joshua BRERETON.  There is also probable cause to search the account described in Attachment A for evidence of these crimes, as described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      The United States, including the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and its state and local partners, are conducting a criminal investigation of Joshua BRERETON regarding possible violations of 18 U.S.C. § 248(a)(3), intentionally damaging or attempting to damage a facility that provides reproductive health services, a violation of the Freedom of Access to Clinical Entrances Act, and 18 U.S.C. § 844(f)(1), arson of an institution or organization receiving federal financial assistance.

7.      On or about July 31, 2022, at approximately 4:12 p.m., the Kalamazoo Department of Public Safety (KDPS) responded to a structure fire at the Kalamazoo Planned Parenthood (Planned Parenthood), a clinical facility that receives federal funding and provides reproductive health services to include medical, surgical, counseling, and/or referral services relating to the human reproductive system.  Planned Parenthood is located at 4201 West Michigan Avenue, Kalamazoo, Michigan 49006.  The structure, which was solely occupied by Planned Parenthood,

2

is described as a single-story brick and concrete building surrounded by an approximately six-foot

tall fence on all sides with a secured gate at the front of the property.

8.     When officers arrived, they noticed an active fire involving the roof and other

exterior areas of the building.  They also noticed the exterior dry pendant sprinkler head that was

on the covered entryway on the south side of the building had been activated due to fire spread.

This sprinkler head contained the fire growth in the area of the entryway, but the fire was able to

grow in the southwest corner of the building that was not protected by a fire suppression system.

Using firefighting equipment, KDPS officers extinguished the bushes and soffit that were on fire

on the exterior of the building.

9.     Once the fire had been extinguished, KDPS Fire Marshal Scott Brooks conducted

a scene assessment and noted two separate points of origin for the fire. The first was in the bushes

located in the south and southwest corner of the building. The second source of the fire appeared

to be from a fire starter log that appeared thrown onto the roof of the building. This information

indicated the fire had been started on the exterior of the building, causing damage to the building,

and working toward the interior of the building before it had been extinguished.

10.     During a review of building surveillance system footage, Fire Marshal Brooks

surmised the suspect breached the exterior fence, utilized a combustible fuel to ignite the exterior

bushes of the building, and then attempted to light a fireplace stater log and throw the burning log

onto the roof of the building before fleeing the scene.

11.     On August 1, 2022, an FBI Task Force Officer (FBI TFO) reviewed the video

surveillance from Planned Parenthood from the date of the fire (July 31, 2022) and noted a male

subject approach from the west side of the Planned Parenthood building on foot. The male subject

was wearing dark colored pants, dark shoes, dark gloves, a camouflage jacket, blue surgical mask,

and a black baseball cap. The subject carried a jug in his right hand and a dark backpack in his left hand.

12.     During a review of on-scene evidence, investigators recovered a portion of the fire starter log that the suspect appeared to have thrown onto the roof.  Investigators examined the log. The wrapping material identified the log as being "Duraflame" Brand.  Investigators then checked local stores that sold "Duraflame" fire logs.  As part of those checks, ATF Special Agents contacted a Wal-Mart asset protection employee at the Kalamazoo Wal-Mart.  A Wal-Mart database check determined a Duraflame fire log had been sold on July 31, 2022, at approximately 2:57 p.m., from the Paw Paw Wal-Mart, located at 1013 South Kalamazoo St., Paw Paw, Michigan 49079.  The fire at Planned Parenthood was first reported to law enforcement on July 31, 2022, at approximately 4:12 p.m.

13.     ATF Special Agents then contacted an asset protection employee from the Paw Paw Wal-Mart.  A check of previous sales revealed that, on July 31, 2022, a male subject, later identified as BRERETON, made two separate purchases, and paid in US Currency.  Wal-Mart provided investigators with the receipts as well as video surveillance footage of both purchases. In the first purchase, BRERETON bought citronella torch fuel, a 2.5-pound Duraflame log, and a utility lighter, as well as various household items such as kitchen sponges and cupcakes.  An FBI TFO noted the fuel container purchased in the first transaction appeared similar to the jug carried by the subject on the surveillance footage from Planned Parenthood.  The second transaction included a black men's hat, which the FBI TFO noted as being similar to the hat worn by the subject in the Planned Parenthood surveillance footage.  During both purchases, which occurred within minutes of each other, BRERETON was wearing dark pants and appeared to match the description of the individual seen in surveillance footage outside of the Planned Parenthood later

4

that same afternoon.  BRERETON was not wearing a mask or hat during the timeframe that he was inside the Wal-Mart.

14.     BRERETON left the Paw Paw Walmart in a lighter colored sedan.  The vehicle was parked too far away to get any additional descriptors other than being able  to  see  that it  is  a  lighter  colored  sedan.    However,  as  explained  below,  investigators  subsequently linked  BRERETON  to  a  beige  or  champagne  colored Chevrolet Malibu sedan.

15.     In the Wal-Mart video, BRERETON was wearing a short sleeve black t- shirt and appears to have a thin mustache, dark cargo style pants, and grayish tan hiking style boots.  In the video, it was clear that BRERETON had a distinct tattoo on his left inner forearm that is a picture of a crown with two cursive words under the crown.

16.     On August 2, 2022, the ATF released to the news  media  pictures  from  the surveillance video showing the subject in this case and requesting assistance from the public in identifying him.

17.     On August 3, 2022, the Kalamazoo Silent Observer tip line received an anonymous tip based upon the news release with the subject's photographs.  The tipster identified the subject in  the  press  release  as  Joshua  BRERETON  who  lived  in  Paw  Paw,  Michigan  and  described BRERETON as being approximately 5'8" tall, weighing 200 pounds, with black hair, brown eyes, in his 20's, with access to weapons.

18.     Using the provided tipster information, the FBI TFO conducted a social media check  and  located  a  Facebook  account  for  an  individual  with  vanity  name  "Joshua  Brereton (Joshy)."  There are numerous open source photographs of BRERETON on this Facebook page. Comparing the photographs of BRERETON on his Facebook page to the surveillance footage of the  subject  purchasing  the  items  at  Wal-Mart,  it  appears  to  be  the  same  person. Finally,  the

5

Facebook page has links to YouTube videos that BRERETON posted. During a review of this open-source social media content, the FBI TFO matched a forearm tattoo of a crown with letters under it to that of the person in the Wal-Mart register surveillance footage.

19.      On August 3, 2022, a KDPS Intelligence Analyst reviewed YouTube videos from BRERETON's account that appeared relevant to this case. The account included a link to the following video –  https://www.youtube.com/watch?v=YW9oAQ4FHnw – entitled "The Line Between Good and Evil."  On July 3, 2022, Brereton posted this video on his YouTube channel "Courageous Conduct: Civilian Self-Defense."  Based on my training and experience, however, I know that individuals who post in electronic forums like YouTube do so over the course of many months and even years. In this case, the channel "Courageous Conduct: Civilian Self-Defense" joined YouTube on or about November 21, 2021 and posted its first video approximately nine months ago.

20.      The video entitled "The Line Between Good and Evil."  is approximately 9 minutes and 13 seconds long. Approximately 32 seconds into the video BRERETON says "… We have this plague in American society that we want to put the responsibility on someone else. 'Oh someone else will take care of that person.' Oh, especially the government. The real plague is we think, oh we can all just pay higher taxes to a government and they'll take care of everything. And that's just not going to work well…"

21.      At 1 minute, 43 seconds into the video, BRERETON says "… Like right now, we have a genocide happening. Genocide! Of babies! And people think this is always a hot topic.  You literally have neighbors who think it's okay to kill a baby.  And I won't get too much into it other than read a science book.  It's not a religious debate.  It's not a political debate.  Scientific law says that the fetus is a brand new human being.  And we're killing that person.  Or some people

are killing those people.  And so we have conflicts of interest.  We have government okays for the killing of peoples…"

22.     At 5 minutes, 5 seconds into the video, BRERETON says "… We think someone else is going to do it. Nobody else is going to do it.  If somebody else was going to do it – they would have.  All right.  If somebody was really going to – it would have already been done…"

23.     At 8 minutes, 37 seconds into the video, BRERETON says "… So step out of your comfort zone.  Lend a hand.  Change society from the inside out.  Don't put it on someone else and let it trickle down.  It doesn't trickle down…"

24.     Further review of open-source information on the Facebook account with account handle "Joshua Brereton (Joshy)" led investigators to posts expressing  pro-life views and depicted the individual owner of the account to be someone who matched BRERETON. Open source records indicate such postings on BRERETON's Facebook timeline beginning on or about July 21, 2022. Based on my training and experience, however, I know that individuals who post items expressing political views on social media such as Facebook do so over the course of many months and even years.

25.     On August 3, 2022, investigators queried BRERETON in a Michigan Secretary of State (SOS) database.  SOS records indicate that BRERETON resides in Paw Paw, MI. SOS records also describe BRERETON as 5'10, 230lbs with brown hair.  The SOS image of BRERETON also shows the same person that was depicted in surveillance footage from Walmart and the same person in the Facebook pictures and YouTube videos.

26.     An SOS query of vehicles registered to Brereton indicates that he owns a 2014 Chevrolet Malibu sedan.  The address on the vehicle's registration is BRERETON's address in Paw  Paw,  MI.    Also  on  August  3,  2022,  investigators  conducted  surveillance  outside

BRERETON's residence in Paw Paw. Also on August 3, 2022, investigators conducted surveillance outside BRERETON's residence in Paw Paw.  As part of that surveillance, early in the afternoon, investigators observed BRERETON arrive driving a beige or champagne colored Chevrolet Malibu bearing a Michigan license plate that comes back registered to BRERETON at his address in Paw Paw.

27.     On August3, 2022, KDPS and ATF arrested BRERETON as he exited his residence located at 600 West Michigan Avenue Apt. 10, Paw Paw, Michigan 49079.

28.     On that same date, KDPS, ATF, and the FBI sought and obtained a federal search warrant for BRERETON's residence in Paw Paw. *See* Case No. 1:22-mj-00334.  Investigators executed the search warrant the same day.  During the search of the premises, investigators located a camouflage jacket that matched that of the one observed in the surveillance footage at the Planned Parenthood during the arson. Investigators found the jacket in a child's crib in a bedroom.  In the same bedroom, investigators also located a social security card issued to Joshua BRERETON.

29.     In the living room, investigators found a pair of boots matching the boots observed in the Wal-Mart check out register surveillance footage.  Lastly, on a clothes rack in a bedroom of the residence, investigators recovered a black hat which appeared to match the hat worn at the arson scene and purchased at the Paw Paw Wal-Mart. Investigators also located household items, such as sponges and a package of cupcakes, that matched those purchased by BRERETON in the Wal-Mart surveillance footage.

## BACKGROUND CONCERNING GOOGLE[1]

30.     Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

31.     In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

32.     Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

33.     Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered

---

[1]     The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages:  the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

34.     YouTube; Google also offers a video platform called YouTube that offers Google Accounts the ability to upload videos and share them with others. Users can create a YouTube channel where they can upload videos, leave comments, and create playlists available to the public. Users can subscribe to the YouTube channels of others, search for videos, save favorite videos, like videos, share videos with others, and save videos to watch later. More than one user can share control of a YouTube channel. YouTube may keep track of a user's searches, likes, comments, and change history to posted videos. YouTube also may keep limited records of the IP addresses used to access particular videos posted on the service. Users can also opt into a setting to track their YouTube Watch History. For accounts created before June 2020, YouTube Watch History is stored indefinitely, unless the user manually deletes it or sets it to auto-delete after three or eighteen months. For accounts created after June 2020, YouTube Watch History is stored for three years, unless the user manually deletes it or sets it to auto-delete after three or eighteen months

35.     Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts

10

and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

36.     When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

37.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

38.     Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

39.     The contents of all media associated with the account on YouTube, whether active, deleted, or in draft, including: copies of videos and other media only if uploaded to, saved to, shared by or shared with the account; playlists; connected applications; associated URLs for each record; creation and change history; privacy settings for each record; and all associated logs, including IP addresses, locations, timestamps, and device identifiers;

40.     A record of the account's YouTube Watch History, including: accessed URLs and their associated duration, privacy settings, edits, comments, likes, chats, and other interactions, including associated URLs; search history; channels; subscriptions; subscribers, friends, and other contacts; IP addresses, change history, location information, and uploading account or identifier; the logs for each access by the account, including IP address, location, timestamp, and device identifier; and change history.

41.     Records associated with the account's YouTube registration, including the account's display name, IP logs, channel ID, account registration information, and registration email.  In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion

42.     Based on my training and experience, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.  Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

43.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

44.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

45.     Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

46.     Based on the forgoing, I request that the Court issue the proposed search warrant.

47.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Google.  Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.